## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JPMORGAN CHASE BANK, N.A., and CHASE
HOME FINANCE LLC

        Plaintiffs,

        v.

BEN-EZRA & KATZ, P.A.,

        Defendant.

CIVIL NO.

FILED by _____ D.C.

MAR 2 5 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

# 11-60655-Civ-COHN/SELTZER

## COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION, BREACH OF CONTRACT, REPLEVIN, AND CONVERSION

        Plaintiffs JPMorgan Chase Bank, N.A. and Chase Home Finance LLC (collectively "Chase") bring this action for injunctive relief and damages against Defendant Ben-Ezra & Katz, P.A. ("Ben-Ezra") as follows.

### Jurisdiction, Venue and Parties

        1.        Plaintiff JPMorgan Chase Bank, N.A. is a national association with its principal place of business in the State of Ohio.  Under 28 U.S.C. § 1348, a national banking association is deemed to be a citizen of the state in which it is located.  Thus, for purposes of establishing diversity jurisdiction, JPMorgan Chase Bank, N.A. is a citizen of Ohio.

        2.        Plaintiff Chase Home Finance LLC is a Delaware limited liability company, and it has one member, Chase Home Finance, Inc., which is a Delaware corporation with its principal place of business in New Jersey.  Thus, for purposes of establishing diversity jurisdiction, Chase Home Finance LLC is a citizen of Delaware and New Jersey.

        3.        Defendant Ben-Ezra & Katz, P.A. ("Ben-Ezra") is a professional association with its principal place of business at 2901 Stirling Road, Suite 300, Fort Lauderdale, Florida 33312 and, for purposes of establishing diversity jurisdiction, is a citizen of Florida.

DB1/66926248.1

MORGAN, LEWIS & BOCKIUS LLP
5300 WACHOVIA FINANCIAL CENTER, 200 S. BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131-2339 · TELEPHONE (305) 415-3000

Ben-Ezra is a law firm that, among other things, represents residential mortgage lenders and servicers in foreclosure proceedings.

4.       The Court has subject matter jurisdiction over Chase's claims pursuant to 28 U.S.C. § 1332(a), in that complete diversity of citizenship exists between Chase (including the sole member of Chase Home Finance LLC, Chase Home Finance, Inc., and Ben-Ezra, and the amount in controversy exceeds $75,000.

5.       The Court has personal jurisdiction over Ben-Ezra because it is organized in Florida, maintains its principal place of business in Florida and regularly conducts business in Florida.

6.       Venue is proper in this District under 28 U.S.C. 1391(b) in that this is the judicial district in which Ben-Ezra resides and a substantial part of the events giving rise to this action occurred within this District.

### Facts

7.       On February 1, 2009, Chase and Ben-Ezra entered into a Master Services Agreement ("MSA") regarding the retention of Ben-Ezra to represent Chase in connection with, among other things, foreclosure proceedings in the State of Florida (the "Agreement"). A redacted copy of the Agreement is attached as Exhibit "A").[1] Marc Ben-Ezra executed the Agreement on behalf of Ben-Ezra, as President. *See* Ex. A at p. 23.

8.       Thereafter, and in accordance with the terms of the MSA, Chase and Ben-Ezra entered into an Attorney – Trustee Schedule (the "Schedule") on February 1, 2009. A

---

[1]    The Agreement has been redacted to avoid releasing information protected by the attorney-client privilege, the work product doctrine, or other applicable privileges and immunities. The Agreement has also been redacted to preserve other proprietary information.

redacted copy of the Schedule is attached as Exhibit "B").[2] Marc Ben-Ezra executed the

Schedule on behalf of Ben-Ezra, as President. *See* Ex. B at p. 22.

        9.        Pursuant to the terms of the MSA and the Schedule, Ben-Ezra represented

Chase in thousands of foreclosure proceedings in Florida.  In connection with its representation

of Chase, Ben-Ezra generated case files and Chase entrusted Ben-Ezra with possession of

thousands of original, executed promissory notes, mortgages and other documents ("Chase

Files").  The collective value of the Chase Files exceeds $400 million dollars.

        10.        On March 8, 2011, Chase terminated the Agreement, which was its right.

A copy of the termination letter to Ben-Ezra is attached as Exhibit C.

        11.        Section II.B of the Schedule addresses termination and provides:

> Chase may terminate your services at any time without prior written
> notice. *See* Ex. B at p. 1.

        12.        As part of the MSA and Schedule, Ben-Ezra agreed that it would

immediately return any Bank Documents upon termination.  Specifically, section II.B of the

Schedule states that:

> Upon termination, [Ben-Ezra] agree[s] to properly execute substitution of
> counsel documents on pending matters *and to immediately forward all
> Bank Documents, as defined below,* and the executed substitutions of
> counsel documents *in accordance with [Chase's] written instructions.*
> *See* Ex. B at p. 1 [Emphasis added]

        13.        Section III.C defines Bank Documents as follows:

> <u>Bank Documents</u>:  bankruptcy files, foreclosure files, *and any other
> documents*, including documents from borrower's loan file, *and other
> items*, including but not limited to funds held by you, with regard to the
> Services to be performed here under. *See* Ex. B at p. 2 [Emphasis added].

---

[2]    The Schedule has been redacted to avoid releasing information protected by the attorney-client
privilege, the work product doctrine, or other applicable privileges and immunities. The Schedule
has also been redacted to preserve other proprietary information.

14.     Included within the Bank Documents are case files and thousands of original, executed promissory notes, mortgages and other documents. The Bank Documents will be referred to as the "Chase Files".

15.     Upon termination for any reason, Section 2.6(c) of the MSA requires Ben-Ezra to assist Chase in obtaining legal services pertaining to the Chase Files from another law firm. It states that:

> During the Transition Period [120 days following termination], [Ben-Ezra] shall perform such other services as mutually agreed to by the parties as are necessary to enable [Chase] to obtain from another service provider, or provide for itself, services to replace the applicable Deliverables being provided by [Ben-Ezra] under the applicable Schedul(s) ("**Transition Services**"). *See* Ex. A at p. 3 [Emphasis in orignial].

16.     Such services necessarily include immediately returning the Chase Files to Chase upon demand as required by Section II.B of the Schedule.

### Defendants' Wrongful Activities

17.     Chase has made repeated demands to Ben-Ezra that it immediately return the Chase Files in accordance with the Section II.B of the Schedule and Section 2.6(c) of the MSA. Despite its contractual and ethical obligations to its former client, Ben-Ezra has not returned or released any of the Chase Files.

18.     Ben-Ezra refuses to release the Chase Files because it claims that it is owed over $5 million dollars in fees and costs. Chase disputes the amount of the fees that are owed, but nevertheless has offered to post a bond in the amount of $2.8 million as security for payment of outstanding invoices for Chase cases involving private investor , FHA, VA, FHLMC and bank-owned notes.[3]  Ben-Ezra, however, refuses to return the Chase Files even though the

---

[3]     On information and belief, the remaining outstanding invoices relate to Fannie Mae notes for which payment is secured by a bond posted by Fannie Mae in its case against Ben-Ezra

posting of such a bond would extinguish its purported ability to retain the files pending payment of the outstanding invoices.

19.        Ben-Ezra's actions have irreparably harmed Chase and will continue to do so unless Ben-Ezra is enjoined from holding the Chase Files hostage.  In Section 13.2 of the MSA, Ben-Ezra agreed that its failure to return Chase Files as part of Transition Services would irreparably harm Chase and entitle it to immediate injunctive relief.  Section 13.2 states that;

> *[Ben-Ezra] agrees that [Chase] will be irreparably harmed* . . . if [Ben-Ezra] breaches (or attempts or threatens to breach) certain terms and conditions hereof which are not generally remedied or would not be fully-remedied or compensated by monetary damages including, without limitation: (a) *its obligation to provide Transition Services as provided in Section 2.6.* . . . If a court of competent jurisdiction finds that the [Ben-Ezra] has breached (or attempted or threatened to breach) any such obligations, *[Ben-Ezra] agrees that, without any additional findings or irreparable injury or other conditions to injunctive relief, it will not oppose entry of an appropriate order compelling performance by [Ben-Ezra] and restraining it from any further breaches* (or attempted or threatened breaches). *See* Ex. A at p. 19 [Emphasis added].

20.        Additionally, Chase is irreparably harmed because it must transfer the cases as quickly as possible to successor counsel so that the parties to these pending cases (some of which may include not only Chase and borrowers, but also other lenders and entities who claim a lien in the subject properties, such as property owners' associations) are not prejudiced by any unnecessary delay in the proceedings.  Without the Chase Files, especially the original executed promissory notes and mortgages, Chase cannot proceed with, transfer, or conclude any of the cases.  Chase is further precluded from performing its duties as servicer under many of the subject cases.

---

pending in the Eleventh Judicial Circuit of Florida styled *Federal National Mortgage Association a/k/a Fannie Mae v. Ben-Ezra & Katz, P.A.*, Case No. 11-003584.

21. Moreover, the original, executed promissory notes and mortgages securing Chase's interests cannot be reproduced.

22. For these reasons, Chase seeks a temporary restraining order as well as a preliminary and permanent injunction ordering Ben-Ezra to immediately release and turn over all of the Chase Files to Chase.

23. All conditions precedent to bringing this action have been performed, have occurred or otherwise have been waived.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT – SPECIFIC PERFORMANCE

24. Plaintiffs repeat and reallege paragraphs 1 through 23 and incorporate them herein by this reference.

25. The MSA and Schedule between Chase and Ben-Ezra regarding the retention of Ben-Ezra to represent Chase in connection with, among other things, foreclosure proceedings in the State of Florida is a valid and enforceable contract.

26. Section II.B of the Schedule requires Ben-Ezra to immediately return any Chase Files upon termination. It states that:

> Upon termination, [Ben-Ezra] agree[s] to properly execute substitution of counsel documents on pending matters ***and to immediately forward all Bank Documents, as defined below,*** and the executed substitutions of counsel documents ***in accordance with [Chase's] written instructions.*** *See* Ex. B at p. 1 [Emphasis added]

27. Upon termination for any reason, Section 2.6(c) of the MSA also requires Ben-Ezra to assist Chase in obtaining legal services on the Chase Files from another law firm, which necessarily includes immediately returning the Chase Files to Chase. Section 2.6(c) states that:

> During the Transition Period [120 days following termination], [Ben-Ezra] shall perform such other services as mutually agreed to by the parties as are necessary to enable [Chase] to obtain from another service provider, or provide for itself, services to replace the applicable Deliverables being provided by [Ben-Ezra] under the applicable Schedul(s) ("**Transition Services**"). *See* Ex. A at p. 3 [Emphasis in orignial].

28.     Chase has made repeated demands to Ben-Ezra that it immediately return the Chase Files in accordance with the terms of the Schedule and the MSA.

29.     Ben-Ezra has breached the Schedule and the MSA by refusing to comply with its obligation under Section II.B and Section 2.6(c) to return the Chase Files.

30.     Chase is entitled to have the Court enforce the terms of the Agreement by ordering Ben-Ezra to return the Chase Files.

31.     Chase is also entitled to the issuance of an injunction preventing Ben-Ezra from further retaining the Chase Files.

32.     Ben-Ezra's actions have irreparably harmed Chase and will continue to do so unless enjoined.  In Section 13.2 of the MSA, Ben-Ezra agreed that its failure to return Chase Files as part of Transition Services would irreparably harm Chase and entitle it to immediate injunctive relief and further agreed that it would not oppose such relief if requested by Chase. Section 13.2 states that;

> *[Ben-Ezra] agrees that [Chase] will be irreparably harmed* . . . if [Ben-Ezra] breaches (or attempts or threatens to breach) certain terms and conditions hereof which are not generally remedied or would not be fully-remedied including, without limitation: (a) *its obligation to provide Transition Services as provided in Section 2.6.* . . . If a court of competent jurisdiction finds that the [Ben-Ezra] has breached (or attempted or threatened to breach) any such obligations, *[Ben-Ezra] agrees that, without any additional findings or irreparable injury or other conditions to injunctive relief, it will not oppose entry of an appropriate order compelling performance by [Ben-Ezra] and restraining it from any further breaches* (or attempted or threatened breaches).  *See* Ex. A at p. 19 [Emphasis added].

33.        Chase has a clear right to the relief requested because the Agreement unequivocally mandates the immediate return of the Chase Files.

34.        Although Chase has suffered damages as a result of Ben-Ezra's breach of the Agreement, it has no adequate remedy at law for the continuing and irreparable harm that will result from Ben-Ezra retaining the Chase Files because the Chase Files contain original documents – including original, executed promissory notes, mortgages, and other documents that evidence and secure thousands of loans owed to Chase and other lenders worth well over $400,000,000, without which Chase will be unable to proceed with any of the pending cases, or in some instances comply with Court orders or discovery requests associated with those pending cases.  This could potentially result in numerous dismissals with prejudice of pending cases, as well as monetary sanctions against Chase, for which there is no adequate remedy at law.

<div align="center">

**SECOND CAUSE OF ACTION**
**REPLEVIN**

</div>

35.        Plaintiff repeats and realleges paragraphs 1 through 23 and incorporates them herein by this reference.

36.        Chase is the owner (or authorized services of the owner) of the Chase Files and is entitled to possession of its property pursuant to the Schedule between the parties, which provides in Section II.B that:

> Upon termination, [Ben-Ezra] agree[s] to properly execute substitution of counsel documents on pending matters *and to immediately forward all Bank Documents, as defined below,* and the executed substitutions of counsel documents *in accordance with [Chase's] written instructions. See* Ex. B at p. 1 [Emphasis added]

and in Section 2.6(c) of the MSA, which states that:

> During the Transition Period [120 days following termination], [Ben-Ezra] shall perform such other services as mutually agreed to by the parties as are necessary to enable [Chase] to obtain from another service provider, or provide for itself, services to replace the applicable Deliverables being

provided by [Ben-Ezra] under the applicable Schedul(s) ("**Transition Services"**). *See* Ex. A at p. 3 [Emphasis in orignial].

37.      Such services necessarily include immediately returning the Chase Files to Chase.

38.      The Chase Files are being wrongfully retained by Ben-Ezra in violation of the Schedule, the MSA and Florida law in Broward County, Florida.

39.      Despite repeated demands, Ben-Ezra has refused to return the Chase Files to Chase.

40.      The Chase Files have not been taken for a tax, assessment, or fine pursuant to law.

41.      The Chase Files have not been taken under an execution or attachment against the property of Chase.

42.      Ben-Ezra's conduct has caused damage to the Chase in an amount to be determined at trial, and unless restrained, will continue to seriously and irreparably impair further the value of the Chase Files as well as Chase's ability to proceed with these cases and protect its investments for which there is no adequate remedy at law.

### THIRD CAUSE OF ACTION
### CONVERSION

43.      Plaintiffs repeat and reallege paragraphs 1 to 23 of the Complaint and incorporate them herein by this reference.

44.      Pursuant to the Schedule and the MSA, Chase delivered portions of the Chase Files, including original, executed promissory notes and mortgages, to Ben-Ezra that are collectively worth more than $400 million dollars.

45.      Chase has repeatedly demanded that Ben-Ezra return of the Chase Files.

46.      Despite these demands and the terms of the Schedule and the MSA, Ben-Ezra refuses to return the Chase Files and has unlawfully retained them in its sole possession and control without permission or authority.

47.      Ben-Ezra has intentionally exercised ownership, possession, and control over the Chase Files that is inconsistent with Chase's, the real owner, right of possession.

48.      Ben-Ezra's conduct has caused damage to the Chase in an amount to be determined at trial, and unless restrained, will continue to seriously and irreparably impair further the value of the Chase Files as well as Chase's ability to proceed with these cases and protect its investments for which there is no adequate remedy at law.

WHEREFORE, Chase prays for judgment against Ben-Ezra as follows:

A.      Enjoining and restraining, by temporary restraining order, preliminary injunction and permanent injunction, Ben-Ezra, its officers, agents, servants, employees, attorneys, and all persons in active concert, privity, or participation with them and each of them individually, from retaining the Chase Files.

B.      Ordering Ben-Ezra to immediately return the Chase Files to Chase.

C.      Ordering Ben-Ezra to preserve the Chase Files until they are delivered to Chase.

D.      Awarding all damages sustained by Chase on account of Ben-Ezra's wrongful retention of the Chase Files and any other damage suffered by Chase as a result of Defendant's acts herein described.

E.      Awarding Plaintiff such other and further relief as this Court may deem proper.

Respectfully submitted,

Morgan, Lewis & Bockius LLP
Counsel for Plaintiff
200 South Biscayne Boulevard – Suite 5300
Miami, Florida 33131-2339
Telephone:      305.415.3456
Facsimile:      305.415-3001
E-mail:         dleon@morganlewis.com


Derek E. León
 Florida Bar No. 0625507
Christopher J.M. Collings
 Florida Bar No. 0184403

Coutract ID No. CW275483_



# Master Services Agreement

### between

## JPMorgan Chase Bank, National Association

### and

## Ben-Ezra & Katz, P.A.
### Dated

### January 29, 2009

Deleted: February 1

Master Services Agreement  12.7.07

Goods/Services
Received/Confirmed



General Services
Contracts Library

## MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") is entered into as of February 1, 2009 ("**Agreement Effective Date**"), by and between JPMorgan Chase Bank, National Association, with an office located at 270 Park Avenue, New York, New York 10017-2070 and Ben-Ezra & Katz, P.A. a **Florida** law firm having its place of business at 2901 Stirling Road, Suite 300, Ft. Lauderdale, FL 33312..

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree to the foregoing and as follows:

## ARTICLE 1
## AGREEMENT STRUCTURE

### Section 1.1    Overview; Schedules.

(a)     This Agreement represents the terms and conditions pursuant to which **Ben-Ezra & Katz, P.A.** and its Affiliates (severally and collectively, "**Supplier**") shall provide Services (as defined in **Section 5.1**) to JPMorgan Chase Bank, National Association and its Affiliates (severally and collectively, "**JPMC**"), pursuant to schedules ("**Schedules**") developed hereunder. Each of the Services and any related deliverables or tangible results of the Services may be referred to herein as a "**Deliverable**" and collectively, as the "**Deliverables**".

(b)     Each Schedule will be a separate document that is signed by both JPMC and Supplier that references this Agreement. Each Schedule will be deemed to incorporate all of the terms of this Agreement.

(c)     If a term in a Schedule conflicts with a term in this Agreement, the provisions of this Agreement will prevail unless the Schedule specifically states that the term in the Schedule will prevail. If terms in this Agreement conflict, the term most closely describing the type of transaction giving rise to the issue will prevail.

### Section 1.2    Each Schedule Is a Separate Agreement.

Each Schedule will be a separate agreement between Supplier and the JPMC entity that signs the Schedule. Only the JPMC entity that signs a Schedule will be liable for JPMC's obligations under that Schedule. The benefits of any Schedule extend to the JPMC entity that signs the Schedule and, to the extent specified in the applicable Schedule or otherwise requested by JPMC, to other JPMC entities, customers, employees, suppliers, business partners and divested companies (each a "**Recipient**" and collectively, the "**Recipients**"). No obligation to purchase any Deliverable(s) is created under or pursuant to this Agreement except through the execution of a Schedule.

### Section 1.3    Interpretation of Certain Terms.

The term "**Affiliate**" means an entity owned by, controlling, controlled by, or under common control with, directly or indirectly, a party. For this purpose, one entity "**controls**" another entity if it has the power to direct the management and policies of the other entity (for example, through the ownership of voting securities or other equity interest, representation on its board of directors or other governing body, or by contract). "**Including**" means including without limitation. The term "**days**" refers to calendar days. "**Business Day**" means Monday through Friday, excluding any official JPMC holidays. "**Supplier Personnel**" means, collectively and singularly, each employee, agent, representative, or other individual working for or on behalf of Supplier or any Supplier subcontractor.

## ARTICLE 2
## TERM AND TERMINATION

**Section 2.1     Term.**

This Agreement is effective from the Agreement Effective Date until terminated in accordance with the terms of this Agreement ("**Term**").

**Section 2.2     Termination for Cause.**

Either party may terminate this Agreement or any Schedule(s), in whole or in part, as of the date specified in a notice of termination if the other party materially breaches its obligations under this Agreement or any Schedule and does not cure that breach within thirty (30) days after receiving the non-breaching party's notice.

**Section 2.3     Termination for Convenience.**

JPMC may terminate this Agreement or any Schedule(s) for convenience, in whole or in part, at any time and without liability by giving Supplier at least thirty (30) days prior written notice of the termination date.

**Section 2.4     Termination for Financial Insecurity.**

Either party may terminate this Agreement or any Schedule, in whole or in part, for cause as of the date specified in a termination notice if the other party: (a) files for bankruptcy; (b) becomes or is declared insolvent; (c) is the subject of any proceedings (not dismissed within thirty (30) days) related to its liquidation, insolvency or the appointment of a receiver or similar officer for that party; (d) makes an assignment for the benefit of all or substantially all of its creditors, (e) takes any corporate action for its winding-up, dissolution or administration; (f) enters into an agreement for the extension or other readjustment of substantially all of its obligations; or (g) recklessly or intentionally makes any material misstatement as to financial condition.

**Section 2.5     Refunds; Post Termination Fees and Costs.**

Upon termination, JPMC will receive a refund of all fees paid in advance for Deliverables not yet provided by Supplier, if any. Supplier shall be paid fees and expenses that have accrued and which are due and owing with respect to the Deliverables up to the effective date of termination of this Agreement. In no event will Supplier's costs include, and Supplier acknowledges that JPMC will not reimburse, unabsorbed overhead or anticipated profits.

**Section 2.6     Transition Services.**

(a)     Upon a complete or partial termination for any reason of this Agreement or any Schedule(s), if requested by JPMC, Supplier will continue to provide the applicable Deliverables for the duration of the time period specified in the applicable Schedule (the "**Transition Period**"); provided, that if no duration is specified in a Schedule then the Transition Period shall be no less than one hundred and twenty calendar days (120) from the actual date of termination (as applicable).

(b)     During the Transition Period, Supplier will continue to make available to JPMC all Deliverables (in accordance with the terms and conditions of this Agreement and the applicable Schedules). Supplier's performance of the Services described in the Schedules during the Transition Period will be performed at the rates set forth in the applicable Schedule(s).

(c)      During the Transition Period, Supplier will perform such other services as mutually agreed to by the parties as are necessary to enable JPMC to obtain from another service provider, or provide for itself, services to substitute for or replace the applicable Deliverables provided by Supplier under the applicable Schedule(s) ("**Transition Services**"). If this Agreement or an applicable Schedule(s) is terminated: (i) due to the occurrence of an uncured material breach by Supplier, the Transition Services will be provided to JPMC at no charge; or (ii) due to the occurrence of: (A) an uncured material breach by JPMC; or (B) a termination without cause by JPMC, the Transition Services described will be provided at Supplier's then-current rates or such other rates as mutually agreed to by the parties for such services.

(d)      Supplier will cooperate in good faith with JPMC and any new service provider selected by JPMC in the performance of its obligations under this **Section 2.6** and Supplier further agrees to work with JPMC and any new service provider in the development and carrying out of a transition plan as part of the Transition Services.

**Section 2.7      Survival.**

After this Agreement terminates, the terms of this Agreement will remain in effect with respect to any Schedule entered into before the termination. However, no Schedule may be entered into under this Agreement after it terminates. After a Schedule terminates or expires, the terms of that Schedule (including those of this Agreement) that expressly or by their nature contemplate performance after the Schedule terminates or expires will survive and continue in full force and effect. For avoidance of doubt, the provisions protecting data, privacy and Confidential Information, regarding data security, permitting audits, providing for rights of quiet enjoyment, granting perpetual licenses, requiring indemnification, and setting forth limitations of liability each, by their nature, contemplate performance or observance after this Agreement or a Schedule expires or terminates.

**ARTICLE 3**
**COMMUNICATIONS**

**Section 3.1      Relationship Managers.**

**Section 3.2      Notices.**

All notices must be in writing and will be deemed given only when sent by first class mail (return receipt requested), hand-delivered or sent by documented overnight delivery service to the party to whom the notice is directed, at its address indicated below or in the applicable Schedule. In addition, where this Agreement states that notice will be given "immediately" after an event occurs, the notifying party will also send an immediate e-mail message to the other party's Relationship Manager. Notices to be given "promptly" will be given, in any event, within five (5) days. A party may change its address for notices by sending a change of address notice using this notice procedure. Supplier will send a copy of each notice required hereunder to JPMC to:

         If to JPMC:
                JPMorgan Chase Bank, N.A.

Contract Management, Mail Code OH1-0638
1111 Polaris Parkway, Suite 1N
Columbus, Ohio 43240-0638
Reference: Contract ID No. CW275483
Fax: (614) 213-9455

With a copy to:

JPMorgan Chase Bank, N.A.
Legal Department, Mail Code NY1-A425
One Chase Manhattan Plaza, 25th Floor
New York, NY 10081
Attention: Workflow Manager
Reference: Contract ID No. CW275483
Fax: (212) 383-0800

If to Supplier:

Ben-Ezra & Katz, P.A
2901 Stirling Road, Suite 300
Ft. Lauderdale, FL 33312
Attention: Mark Ben-Ezra
Fax: (305) 653-2329

**Section 3.3     Notice of Change of Status.**

Supplier will notify JPMC promptly of any actual or threatened occurrence of any event that materially affects, or that could reasonably be expected to materially affect, Supplier's ability to perform fully its obligations to JPMC.

**Section 3.4     Financial Information.**



**Section 3.5     Audits.**



Master Services Agreement  12.7.07

**Section 3.6**     **Publicity.**



## ARTICLE 4
## COMPENSATION

**Section 4.1**     **Invoices.**

**Section 4.2**     **Payments.**

**Section 4.3**     **Most Favored Customer.**

**Section 4.4**     **Expenses.**

**Section 4.5**     **Credits.**

Master Services Agreement 12.7.07



**Section 4.6     Right to Set Off.**

JPMC will have the right to set off amounts owed by Supplier or any of Supplier's Affiliates to JPMC under this Agreement against amounts payable by JPMC under this Agreement.

**Section 4.7     Invoice Disputes.**

In the event of a good faith dispute with regard to an item appearing on an invoice, JPMC may withhold the disputed amount while the parties attempt to resolve the dispute in accordance with **Article 13**. JPMC's withholding of that payment will not constitute a breach of this Agreement or be grounds for Supplier to suspend its obligations under this Agreement.

**Section 4.8     Taxes.**



**Section 4.9**    <u>Records</u>.



<div align="center">

**ARTICLE 5**
**SERVICES; SUPPLIER PERSONNEL**

</div>

**Section 5.1**    <u>Performance of Services</u>.

**Section 5.2**    <u>Materials, Facilities and Assistance for Performance of Services</u>.

**Section 5.3**    <u>JPMC Requirements of Supplier Personnel</u>.

Master Services Agreement 12.7.07

Contract ID No. CW275483                                                                    Page 8



**Section 5.4**     <u>**Replacement of Supplier Personnel.**</u>

Master Services Agreement  12.7.07



**Section 5.5    Right of Supplier Personnel to Work in the United States.**

**Section 5.6    Compliance with Security Procedures in Performance of Services.**

### ARTICLE 6
### (INTENTIONALLY OMITTED)

### ARTICLE 7
### CONFIDENTIALITY

**Section 7.1    Confidential Information.**

**Section 7.2    Obligations.**

Master Services Agreement  12.7.07



**Section 7.3**    **Exceptions to Confidential Treatment.**

(a)    Exclusions.

(b)    Legally Required Disclosure.

**Section 7.4**    **Return or Destruction.**

Section 7.5    Equitable Relief.

**Section 7.6**    **Survival.**

Master Services Agreement  12.7.07

The provisions of this **Article 7** will survive any expiration or termination of this Agreement or any Schedule.

<div align="center">

**ARTICLE 8**
**PRIVACY TERMS**

</div>



<div align="center">

**ARTICLE 9**
**DATA HANDLER**

</div>

**Section 9.1    Definition of JPMC Data.**

**Section 9.2    Ownership of JPMC Data.**

**Section 9.3    Grant of License to Use JPMC Data; Obligation to Notify JPMC.**

**Section 9.4    JPMC Data Storage.**

Master Services Agreement  12.7.07



**Section 9.5**     <u>Access by JPMC to JPMC Data.</u>



     **Section 9.6**     <u>Compliance of Data Handler with ISO 27002 and IT Risk Management Policies.</u>



**Section 9.7      Information Security Audits of Data Handler.**



**Section 9.8      Protection of JPMC Data in the Event of Data Handler Bankruptcy.**



**Section 9.9**     **Regeneration of JPMC Data by Data Handler.**



**Section 9.10**     **Return or Destruction of JPMC Data.**



**Section 9.11**     **Survival of Data Handler Terms.**



### ARTICLE 10
### REPRESENTATIONS AND WARRANTIES AND CERTAIN COVENANTS

**Section 10.1**     **Authority.**

Each party represents ands warrants that it has:  (a) all requisite legal and corporate power to execute and deliver this Agreement and each Schedule; (b) taken all corporate action necessary for the authorization, execution and delivery of this Agreement and each Schedule; (c) no agreement or understanding with any third party that interferes with or will interfere with its performance of its obligations under this Agreement and each Schedule; (d) obtained and will maintain all rights, approvals and consents necessary to perform its obligations and grant all rights and licenses under this Agreement and each Schedule; and (e) taken all action required to make this Agreement and each Schedule a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

**Section 10.2**     **No Inducements.**

Master Services Agreement  12.7.07



**Section 10.3**     __Compliance with Laws__.

**Section 10.4**     __Non-Infringement__.

**Section 10.5**     __Adequate Documentation__.

**Section 10.6**     __Services Warranty__.

**Section 10.7**     Sufficient Supplier Personnel.

**Section 10.8**     **Viruses and Embedded Code.**



**Section 10.9    Segregation of Funds.**



**Section 10.10    Identification of Creditor.**

### ARTICLE 11
### INDEMNITY; LIMITATION OF LIABILITY

**Section 11.1    Indemnification.**



**Section 11.2**    **Limitation of Liability.**



**ARTICLE 12**
**EQUAL EMPLOYMENT OPPORTUNITY;**
**DIVERSE SUPPLIERS**

**Section 12.1**    **Equal Employment Opportunity; Employment Laws.**



Master Services Agreement  12.7.07



## ARTICLE 13
## DISPUTE RESOLUTION

**Section 13.1     Dispute Resolution.**

Except where injunctive or other equitable relief is being sought by a party, neither party will invoke formal dispute resolution procedures other than in accordance with this **Section 13.1**.  Either party may give the other party notice of any dispute not resolved in the normal course of business.  Within fifteen (15) days after delivery of that notice, the receiving party will provide a written response.  Within fifteen (15) days after delivery of the receiving party's written response, executives of the parties who have authority to resolve the dispute will meet to attempt to resolve the dispute. All reasonable requests for information will be honored.  If the matter has not been resolved within forty-five (45) days after the disputing party's initial notice, or if the executives fail to meet within fifteen (15) days of the date of the receiving party's response, either party may commence legal action with respect to the dispute or claim. All negotiations pursuant to this **Section 13.1** will be confidential and treated as compromise and settlement negotiations for purposes of all similar rules and codes of evidence of applicable legislation and jurisdictions.

Master Services Agreement  12.7.07

### Section 13.2    Immediate Injunctive Relief.

Supplier acknowledges that JPMC will be irreparably harmed and **Section 13.1** will not apply if Supplier breaches (or attempts or threatens to breach) certain terms and conditions hereof which are not generally remedied or would not be fully-remedied or compensated by monetary damages including, without limitation:  (a) its obligation to provide Transition Services as provided in **Section 2.6**, (b) its obligation of continued performance in accordance with **Section 13.3**, (c) its obligations under **Section 3.6**, or (d) its obligations with respect to privacy, data security or Confidential Information.  If a court of competent jurisdiction finds that Supplier has breached (or attempted or threatened to breach) any such obligations, Supplier agrees that, without any additional findings of irreparable injury or other conditions to injunctive relief, it will not oppose the entry of an appropriate order compelling performance by Supplier and restraining it from any further breaches (or attempted or threatened breaches).

### Section 13.3    Continued Performance.

If a dispute is being resolved before the applicable Schedule expires, each party will, unless otherwise directed by the other party, continue performing its obligations to the other party (other than JPMC's obligation to pay amounts disputed in good faith).

### Section 13.4    Governing Law; Jurisdiction.

This Agreement will be governed by and construed in accordance with the applicable laws of the State of New York, without giving effect to the principles of that State relating to conflicts of laws.  Each party irrevocably agrees that any legal action, suit or proceeding brought by it in any way arising out of this Agreement must be brought solely and exclusively in, and will be subject to the service of process and other applicable procedural rules of, the State or Federal courts in the state of New York, and each party irrevocably submits to the sole and exclusive personal jurisdiction of the courts in New York, generally and unconditionally, with respect to any action, suit or proceeding brought by it or against it by the other party. Notwithstanding the foregoing, claims for equitable relief may be brought in any court with proper jurisdiction within the United States.  The United Nations Convention on the International Sale of Goods does not apply to the transactions contemplated by this Agreement.  The Uniform Computer Information Transactions Act ("**UCITA**") shall not apply to this Agreement or any Schedule regardless of when and howsoever adopted, enacted and further amended under the laws of the State of New York or any other state. If UCITA is adopted and enacted in the State of New York or any other state and, as a result of such adoption and enactment or any subsequent amendment thereto, the parties are required to take any action to effectuate the result contemplated by this Section, including amending this Agreement, the parties agree to take such action as may be reasonably required, including amending this Agreement accordingly.

### Section 13.5    Waiver of Jury Trial.

Both parties agree to waive any right to have a jury participate in the resolution of the dispute or claim, whether sounding in contract, tort or otherwise, between any of the parties or any of their respective affiliates arising out of, connected with, related to or incidental to this Agreement to the fullest extent permitted by law.

<div align="center">

**ARTICLE 14**
**GENERAL**

</div>

### Section 14.1    Interpretation.

Each party acknowledges that this Agreement has been the subject of active and complete negotiations, and that this Agreement should not be construed in favor of or against any party by reason of the extent to which any party or its professional advisors participated in the preparation of this Agreement.

### Section 14.2    Assignment.

Neither party may assign any rights or delegate any obligations under this Agreement without the prior written consent of the other party, which consent will not be unreasonably withheld or delayed. However, JPMC may assign this Agreement, any Schedule, or any of its rights under each of the preceding, in whole or in part, without Supplier's consent:  (a) to any existing or future JPMC entity; or (b) to another JPMC Affiliate or to an acquirer or successor-in-interest to JPMC or one of its Affiliates in the case of a JPMC merger, acquisition, divestiture, consolidation or corporate reorganization (whether or not JPMC is the surviving entity).  Any assignment or attempted assignment contrary to this **Section 14.2** will be a material breach of this Agreement and null and void.  This Agreement and each Schedule will be binding upon the successors, legal representatives and permitted assigns of the parties.  For purposes of this **Section 14.2**, any merger or other combination by operation of law with respect to Supplier constitutes an assignment requiring consent hereunder.

### Section 14.3    Acquisition of Entity with Existing Relationship.



### Section 14.4    Counterparts.

This Agreement may be executed in two or more counterparts (including by facsimile), each of which will be considered an original but all of which together will constitute one agreement.

### Section 14.5    (Intentionally Omitted).

### Section 14.6    (Intentionally Omitted)

### Section 14.7    Headings.

The headings in this Agreement are for convenience of reference only.  They are not to affect the interpretation of this Agreement.

### Section 14.8    Independent Contractors.

(a)      Supplier and JPMC will at all times be independent contractors.  Neither party will have any right, power or authority to enter into any agreement for or on behalf of, or to assume or incur any obligation or liabilities, express or implied, on behalf of or in the name of, the other party.  This Agreement will not be interpreted or construed to create an association, joint venture or partnership between the parties or to impose any partnership obligation or liability upon either party.  Except as set forth in the applicable Schedule, each party's employees, methods, facilities and equipment will at all times be under its exclusive direction and control.

Master Services Agreement  12.7.07

(b)      Supplier alone shall be responsible for all payments due to Supplier Personnel, including (where applicable) wages, reimbursement of expenses, remittance to proper authorities of all required income and social security withholding taxes, unemployment insurance payments and taxes, disability insurance payments and taxes and all other wages, amounts or benefits owed or payable to, or on behalf of, such person. Supplier will be responsible for procuring, processing and handling all Supplier Personnel, including their salaries, wages and per diem and living allowances. In addition, Supplier shall take full responsibility for discharging all obligations imposed by Law including Worker's Compensation Insurance payments, personnel customs duties, benefits under law or collective labor contracts, applying for and obtaining passports, visas and work permits required by the government of the country where Services are to be performed, arranging medical examinations and inoculations and complying with all other immigration requirements of the country where Services are to be performed and for any Losses (including fines, penalties and costs) incurred by JPMC by virtue of Supplier's or a subcontractor's failure to perform or properly perform such obligations.

### Section 14.9      Insurance.

Supplier will, at its own cost and expense, maintain in full force and effect throughout the term of any Schedule (and thereafter as may be required hereunder) the insurance policies listed in the **JPMC Insurance Exhibit** attached hereto.

### Section 14.10   No Modification.

No amendment, modification or change of this Agreement will be valid unless in writing and signed by an authorized representative of the party to be bound. No pre-printed information on invoices, purchase orders or shrink-wrap, click-wrap or browse-wrap agreements or the like will have any force or effect between the parties. Payment of an invoice does not constitute an agreement to the content of the invoice.

### Section 14.11   Other Suppliers; Commitment.

This is not an exclusive agreement. Supplier acknowledges that JPMC uses (and reserves the right to continue to use) other suppliers to provide goods and services that are similar or related to the Deliverables. Supplier will, to the extent reasonably requested by JPMC, cooperate in good faith and in a timely manner with JPMC's other suppliers to allow the suppliers to efficiently perform services for JPMC and its customers.

### Section 14.12   Rights and Remedies Cumulative.

Unless expressly stated otherwise in this Agreement, all rights and remedies provided for in this Agreement will be cumulative and in addition to, and not in lieu of, any other remedies available to either party at law, in equity or otherwise. If JPMC has a choice of one action or another action, JPMC may take either or both of those actions.

### Section 14.13   Severability.

If any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, that provision will be deemed to be restated to reflect as nearly as possible the original intentions of the parties in accordance with applicable law. The remaining provisions of this Agreement and the application of the challenged provision to persons or circumstances other than those as to which it is invalid or unenforceable will not be affected, and each of those provisions will be valid and enforceable to the full extent permitted by law.

### Section 14.14   Subcontractors.

Supplier will not subcontract to any third party the provision of any Deliverable without: (a) notifying JPMC of the components of the Deliverables affected, the scope of the proposed subcontract, the identity and qualifications of the proposed subcontractor and the reasons for subcontracting the work in question; (b) causing the proposed subcontractor to agree in writing to perform and be subject to all of Supplier's obligations under this Agreement (JPMC has the right to review any such agreement upon request); and (c) obtaining JPMC's prior written approval of that subcontractor. JPMC may revoke its approval of any subcontractor by giving Supplier thirty (30) days' prior notice describing a reasonable basis for the revocation. Notwithstanding any approval by JPMC, Supplier will remain solely responsible for all Deliverables and the obligations hereunder and under the Schedule(s) and will be liable for any subcontractor's failure to perform or abide by the provisions of this Agreement.

### Section 14.15   Third Party Beneficiaries.

Supplier acknowledges and agrees that each Recipient is an intended third party beneficiary of this Agreement and is entitled to rely upon all rights, representations, warranties and covenants made by Supplier in this Agreement to the same extent as if each of those Recipients were JPMC. All rights and benefits granted under this Agreement to JPMC will be deemed granted directly to JPMC and any Recipients. Otherwise, no third party will be deemed to be an intended or unintended third party beneficiary of this Agreement.

### Section 14.16   Waivers.

The failure of either party to enforce strict performance by the other party of any provision of this Agreement or to exercise any right under this Agreement will not be construed as a waiver to any extent of that party's right to assert or rely upon any provision of this Agreement or right in that or any other instance. A delay or omission by JPMC or Supplier to exercise any right or power under this Agreement will not be construed to be a waiver of that right or power. All waivers must be in writing and signed by the party waiving rights.

### Section 14.17   No Liens.

Supplier will not and will not permit Supplier Personnel to file any mechanic's or materialman's liens or any security interests on or against property or realty of JPMC to secure payment under this Agreement. If any liens or interests arise as a result of Supplier's action or inaction, Supplier will remove the liens at its sole cost and expense within ten (10) Business Days. The terms and conditions of this **Section 14.17** shall survive the expiration or termination of this Agreement.

### Section 14.18   Disaster Recovery Plan for Services.

(a)      Throughout the Term, Supplier will maintain a disaster recovery plan (a "**DRP**") to provide the Services, together with Supplier's capacity to execute the DRP. The DRP will, at a minimum, conform to the standards set by the Federal Financial Institutions Examination Council (if applicable) or be as acceptable to JPMC, as well as any additional requirements set forth in the applicable Schedule. Any breach of this Section will be deemed a material breach of this Agreement.

(b)      Within five (5) days after signing the applicable Schedule and on an annual basis thereafter, Supplier will provide JPMC with an executive summary of Supplier's then-current version of the DRP.

(c)     Supplier will perform disaster recovery tests at least annually.  Supplier will provide JPMC a written description of all DRP test results in sufficient detail to allow JPMC to assess the success of each test.

(d)     Upon the occurrence of any disaster requiring use of the DRP, Supplier will promptly:  (i) notify JPMC of the disaster; and (ii) provide JPMC access to the Services in a manner that is at least equal to the access provided to Supplier's other customers.  If JPMC determines that Supplier has not complied or cannot comply with the provisions of this Section or implement the DRP quickly enough to meet JPMC's needs, Supplier will promptly assist and support JPMC in obtaining the Services from an alternate provider.

### Section 14.19   Force Majeure.

Each party shall be excused from performance under this Agreement and shall have no liability to the other party for any period it is prevented from performing any of its obligations, in whole or in part, as a result of material delay caused by the other party or by an act of God, war, terrorism, civil disturbance, court order (except for such court order as may prohibit JPMC's payment for the Deliverables provided hereunder), or natural disaster (each, a "**Force Majeure Event**"), but specifically excluding:  (a) labor and union-related activities, and (b) the non-performance of any Supplier Personnel (unless such non-performance is due to a Force Majeure Event).  If any of the above-enumerated circumstances prevent, hinder or delay performance or are expected to hinder or delay performance of Supplier's obligations hereunder for more than ten (10) calendar days, JPMC may, at its option, terminate this Agreement (in whole or in part) without liability or penalty as of the date Supplier receives written notice of termination.

### Section 14.20   Entire Agreement.

This Agreement, including the Exhibits attached to this document, and every Schedule executed under this Agreement are fully incorporated into this Agreement and constitute the entire agreement of the parties, superseding all prior agreements and understandings as to the subject matter hereof, notwithstanding any oral representations or statements to the contrary.  Any JPMC rights not expressly granted are reserved by JPMC.

Duly authorized representatives of each of the parties have executed this Master Services Agreement as of the Agreement Effective Date.

**JPMORGAN CHASE BANK,**                   **Ben-Ezra & Katz, P.A.**
**NATIONAL ASSOCIATION**

By                                         By: _____ as its president

Name:                                      Name: _Merc Ben-Ezra_

Title:  V P SPS                            Title: _president_

Master Services Agreement 12.7.07

Contract ID No. CW275487

ORIGINAL

**Attorney – Trustee Schedule CW275487**
**to the Master Services Agreement**
**Dated February 1, 2009 by and between**
**JPMorgan Chase Bank, National Association**
**and**
**Ben-Ezra & Katz, P.A.**

ALL-STATE LEGAL® EXHIBIT B

This Schedule CW275487 ("**Schedule**") is entered into as of the Schedule Effective Date (as defined herein in **Section II**) by and between Chase Home Finance, LLC ("**CHL**", "**we**" or "**us**") and Ben-Ezra & Katz, P.A. ("**Attorney/Trustee**, "**the Firm**" or "**you**"), and together with the Master Service Agreement (CW275483), dated February 1, 2009 between JPMC and Attorney/Trustee (the "**Agreement**"), constitutes an agreement pursuant to which CHL shall receive and Attorney/Trustee shall provide the various Services, all as more fully described herein.

## I.   INCORPORATION OF AGREEMENT.

The terms and conditions of the Agreement shall apply to this Schedule and such terms and conditions are fully incorporated herein by this reference. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Agreement. Unless otherwise specifically noted herein, references in this Schedule to Sections, Exhibits or Attachments will refer to the Sections, Exhibits or Attachments of this Schedule.

## II.   TERM.

A.   The term ("**Term**") of this Schedule shall commence on February 1, 2009 (the "**Schedule Effective Date**") and shall continue in full force and effect until terminated in accordance with the terms hereof and/or the Agreement.

B.   CHL may terminate your services at any time without prior written notice. This Schedule and its corresponding Agreement in no way constitute a guarantee of referrals or casework of any kind. Upon termination, you agree to properly execute substitution of counsel documents on pending matters and to immediately forward all Bank Documents, as defined below, and the executed substitutions of counsel documents in accordance with CHL's written instructions.

Goods/Services
Received/Confirmed

General Services
Contracts Library

Contract ID No. CW275487

## III.    **DEFINITIONS**.

A.    Agency/Insurer: The Federal National Mortgage Association ("Fannie Mae" or "FNMA"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), the Veteran's Administration ("VA"), the Federal Housing Administration ("FHA") / U. S. Department of Housing and Urban Development ("HUD"), or the private mortgage insurance company, as applicable.

B.    Agency/Insurer Requirements: The applicable rules, regulations, announcements, notices, directives, instructions, servicing guides and mortgagee letters of the Agency/Insurer, as applicable, all as may be amended from time to time, including but not limited to time frames for processing files. Unless otherwise instructed by CHL, private investor loans will be governed by FNMA's requirements.

C.    Bank Documents: bankruptcy files, foreclosure files, and any other documents, including documents from a borrower's loan file, and other items, including but not limited to funds held by you, with regard to the Services to be performed here under.

D.    Direct Source Attorneys: Direct Source attorneys do not involve outsourcers and provide updates directly to CHL systems.

E.    iClear: CHL's web-based billing system

F.    Outsourcer: CHL's chosen supplier to review and prepare loan files for foreclosure or bankruptcy proceedings.

G.    Proof of Claim: Document detailing funds owed to CHL by borrower in conjunction with bankruptcy filing, including a bankruptcy filing that occurs during a foreclosure.

H.    Vendorscape: CHL's web-based referral and tracking system for the Services.

All other terms not specifically defined herein shall have the meanings ascribed in the Agreement.

## IV.    **GENERAL**.



Contract ID No. CW275487



Contract ID No. CW275487



**V.**    **DESCRIPTION OF SERVICES**.



   **A.**    **Foreclosures**.

        1.  **Commencing Proceedings**.

Contract ID No. CW275487



2. **Bankruptcy/Foreclosure Reinstatements/Payoffs and 3rd Party Foreclosure Proceeds**.



Contract ID No. CW275487



3. **Foreclosure Sales**.





Contract ID No. CW275487



Contract ID No. CW275487



5.  **FHA Loans**.

Contract ID No. CW275487



6.  **VA Loans**,

7.  **Conventional Loans**.

8.  **Post- Sale.**

Contract ID No. CW275487



Contract ID No. CW275487



9.  **Litigation**.



Contract ID No. CW275487



10. **Deficiency Judgments**.



B.       **Replevins**.



Contract ID No. CW275487



**C.**   **Bankruptcies**.

1.   **General**.



Contract ID No. CW275487



Contract ID No. CW275487



2.  **Chapter 13 Bankruptcies**.



Contract ID No. CW275487



3.  **Chapter 7 and 11 Bankruptcies**.



4.  **Motion for Relief**.



Contract ID No. CW275487



5.  **Termination of Automatic Stay**.



6.  **Objection of Confirmation**.



D.     **Alternatives to Foreclosure**.

Contract ID No. CW275487



2.  **Deed-in-Lieu**.



3.  **Loan Modification**.

Contract ID No. CW275487

    4.  **Partial Claims**.

**E.**    **Foreclosure Loss Mitigation Solicitation**.

**VI.**    **FEES**.

Contract ID No. CW275487

authorized by the borrower's loan documents or (ii) that violates relevant law or any court order limiting your fees and expenses.

F. The per hour charge of $150.00 may only be charged for litigated issues or upon CHL requested special projects. Any charges in excess of the allowed rate or hourly billings must be approved by CHL in writing prior to billing. Bills in excess of the allowed rate or hourly billings not previously approved by CHL will not be paid.

G. Document retrieval fees will be reimbursed when it is necessary to obtain documents from third parties (e.g., county or district clerks, county recorders, etc.) in order to proceed with and/or complete the foreclosure and/or bankruptcy process timely.

H. Costs for phone calls, postage, copying, courier, overnight mail, faxing, long distance phone charges and other such ancillary expenses are all considered the cost of doing business and will not be paid by CHL or borrowers.

**VII.** **INVOICING**.



Contract ID No. CW275487



Contract ID No. CW275487

ORIGINAL

**VIII.**   **MEETINGS AND REPORTING.**

**IX.**   **ADDITIONAL TERMS AND CONDITIONS.**

Duly authorized representatives of each of the parties have executed this Schedule as of the Schedule Effective Date.

**CHASE HOME FINANCE, LLC**              **Ben-Ezra & Katz, P.A.**

By:                                      By: _____, as its president

Name: _____                   Name: Marc Ben-Ezra

Title: VP SPS                            Title: president

Date: 3|26|09                            Date: February 2 2009

Contract ID No. CW275487

## Exhibit A

Direct Source Procedures

See Attached Direct Source Program Guide

Mar-09-2011 03:13 PM JP Morgan Chase 904-462-1441                    1/1

# CHASE 

March 9, 2011

Ben-Ezra & Katz, P.A.
2901 Stirling Road, Suite 300
Ft. Lauderdale, FL 33312

ATTENTION: Marc Ben-Ezra and David Rodstein

Re: Termination and File Transfer

Dear Mr. Ben-Ezra and Mr. Rodstein,

As discussed on 3/8/11, Chase has decided to terminate its relationship with your firm. Effective immediately, Chase will no longer refer foreclosure, eviction or bankruptcy cases to your firm and all pending matters (active and suspended) will be reassigned. This notice pertains only to referrals originating from Chase's consumer mortgage and home equity business (including heritage WaMu and heritage EMC) and does not affect any other business relationships you may have with Chase.

I ask for your complete and continued cooperation in transferring these files. Vicky Weaver will coordinate the transfer of all electronic and tangible files (including any collateral files) with your office and the new firm.

Sincerely,

Ashley Deel
Vice President
Attorney Management
Phone: (904) 462-1155
Email: ashley.r.deel@chase.com